## Case No. 6,992.

### The IANTHE.

[3 Ware, 126.] 1

District Court, D. Maine. Nov. 10, 1856.

FISHERMEN—LIEN FOR WAGES—SHIPPING CONTRACT.

1. Fishermen who ship for a fishing voyage under a written contract, have a lien on the vessel for six months after the service is ended, and the fish sold for the value of their shares, which may be enforced by process in admiralty.

2. But the statute makes no provision for fishermen who ship without a written agree-

1 [Reported by George F. Emery, Esq.]

ment, but leaves them to the rights which their contract by law gives them.

3. The act of 1790 [1 Stat. 131]. which allows to seamen shipped without a written contract the highest rate of wages, does not apply to fishing voyages.

[Cited in The Grace Darling, Case No. 5,651.]

In admiralty.

T. J. Sewall and Geo. F. Shepley, for libellants.

A. Merrill, for respondent.

WARE, District Judge. This is a libel in rem for wages. The libellants shipped on board the Ianthe, a vessel engaged in the mackerel fishery, on the 22d of July, 1856, for a fishing voyage, and served until September 25, when they were discharged. No agreement in writing was made with either of them, and they now claim, under the statute of July 20, 1790, c. 29, § 1, the highest rate of wages. That act requires every master or commander of a vessel of the burthen of 50 tons, or more, bound to any foreign port, or to a port in any other than an adjoining state, to make an agreement in writing or print with every mariner, not an apprentice of himself or the owners, declaring the voyage or voyages, term or terms of time, for which such seaman or mariner shall be shipped, and in default of this, 'he shall pay every such seaman or mariner the highest price or wages which shall have been given at the port or place where such seaman or mariner shall have been shipped, for a similar voyage, within three months before the time of such shipping.' The act of February 22, 1803, c. 9, § 1 (2 Stat. 203), requires the master of every vessel bound on a foreign voyage, before the clearance of his vessel, to deliver to the collector of the port 'a list containing the names of his crew, places of birth and residence, as far as he can ascertain, and a description of the persons who compose the ship's company,' a certified copy of which, shall be delivered to him by the collector. The act of July 20, 1840, c. 48, §§ 1, 10 (5 Stat. 395), provides that 'all shipments of seamen made contrary to the provisions of this or any other act of congress, shall be void; and any seaman so shipped may leave the service at any time, and demand the highest rate of wages paid to any seaman shipped for the voyage, or the sum agreed to be given him at the time of his shipment.' These acts being in pari materia, and not conflicting with one another, may all be considered as equally in force, and a seaman shipped without a contract in writing or print, may quit the ship when he pleases—is not bound by the regulation, nor subject to the penalties and forfeitures of the act of 1790 (see section 1), and may demand the highest rate of wages paid within three months of his shipment, at the port where he shipped, or the highest wages paid to any of the crew. But these acts apply only to vessels bound either to a foreign port,

or to a port in a state, other than an adjoining state. This vessel was bound to neither, but on a general fishing cruise. She is certainly not within the words of any of these statutes, nor do I see that she is within their general reasons or policy.

The fishing trade of the country is, and always has been, regulated by its own appropriate and peculiar system of laws. The first act of congress on the subject is that of February 16, 1792, c. 6 (1 Stat. 229). This was a temporary act, and expired by its own limitation at the end of seven years, and the end of the next session of congress. But it was continued in force by the act of April 12, 1800 (2 Stat. 36), for ten years longer. Then followed the act of June 19, 1813, c. 9 (3 Stat. 2). This appears to be, in substance, a re-enactment of the 4th and 5th sections of the act of 1792, omitting that part of the act which related to the bounties. The first section of this act requires the master or skipper of any vessel of twenty tons burthen or more, qualified for carrying on the bank or other cod fisheries, and bound from any port of the United States, to be employed in such fishery, before proceeding on the voyage, to make an agreement in writing or print, with every fisherman employed (except only an apprentice to him or the owners); that this agreement, in addition to such terms as may be agreed upon by the parties, shall express whether the same is to continue for one voyage or the fishing season, and also that the fish or proceeds of the voyage, which may appertain to the fishermen, shall be divided among them in proportion to the quantity taken by each, and that this agreement shall be countersigned by the owner of the vessel. It provides also, that if any seaman who shall have signed the agreement shall desert, he shall be subject to the same penalties as seamen are, deserting from the merchant service, and like them be liable to be apprehended on complaint and detained. The second section provides, when such an agreement is made and signed, and the fish taken have been cured and sold by the owner, that the vessel shall for six months after such sale, be liable for the skipper's and each seaman's share, and may be proceeded against as any other vessel may be for seamen's wages, and on such process the owners shall produce a just and true account of the sales and division of the fish, according to the agreement, otherwise the ship shall be answerable for the highest value of the shares demanded.

The act of May 24, 1828 [4 Stat. 312], merely provides for licensing vessels for carrying on the mackerel fishery, according to the licensing act of 1793 [1 Stat. 305], and applies to them all the provisions of that act. These are all the provisions of law that I find, which are applicable to this libel. If we suppose that the regulations for vessels engaged in the cod fishery may be extended to the mackerel fishery, as far as they are in

their nature applicable, they will not reach the present libel. This act does not contemplate or provide for the case of a fisherman shipped without a written agreement, and by not providing for it, leaves the rights of the parties to be determined by the principles of law governing other parol contracts, that is, it leaves them just such rights as are secured by their agreements, and gives them no others. The act of 1790, allowing to seamen, shipped without a contract in writing, the highest wages, notwithstanding any parol contract, is confined to cases of vessels bound on a foreign voyage, or to a domestic port other than that of an adjoining state. It does not extend to the trade between ports of the same state, nor with them of an adjoining state, nor can it be made to reach an ordinary fishing voyage, without doing violence to the language or interpolating words which the legislature have not seen fit to use. My opinion is that the claim set up by this libel, cannot be maintained, and that the libellants can recover nothing more than is provided by their agreement.